UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**15 CV 3610**

MERITAGE DATA INC.,

   *Plaintiff,*

v.

MD INSIDER, INC.,

   *Defendant.*

Civil Action No. _____

**COMPLAINT**

Plaintiff, Meritage Data Inc. ("Meritage"), by and through its undersigned attorneys, as and for its Complaint against defendant MD Insider, Inc. ("MD Insider"), hereby alleges as follows:

## Nature of the Action

1. Plaintiff Meritage collects data from disparate sources throughout the health care industry, manipulates this data with complex, proprietary algorithms and business logic, and develops extensive provider profiles for licensure to and use by the broader healthcare industry.

2. One of Meritage's clients is Defendant MD Insider, with whom Meritage entered into a Data Licensing Agreement ("the Agreement"). (A copy of the Agreement is attached hereto as Exhibit 1.) MD Insider provides health care users with physician performance profiles, using data acquired from sources such as Meritage.

3. Under the Agreement, Meritage licensed certain of its proprietary, confidential data to MD Insider for specified fees, in order for MD Insider to employ this data in developing its derivative provider profiles.

4. The terms of the license granted to MD Insider under the Agreement were

clear. MD Insider was allowed to incorporate Meritage's proprietary data into its own derivative physician profile products for sale and dissemination to its clients, but it was not permitted to pass Meritage's data on to third parties in its original form. This prohibition was spelled out in three different sections of the Agreement – in the provision granting MD Insider a license to use Meritage's data, in the provision setting forth the use limitations on the license granted, and in the confidentiality provision of the Agreement.

5. The need for Meritage to keep its proprietary data confidential, and to prohibit its dissemination to third parties, is paramount. Should Meritage's competitors or others in the industry gain access to Meritage's confidential, proprietary data in its original form, they could discover how Meritage develops is provider profiles, allowing them to copy Meritage's work and to rob Meritage of its proprietary intellectual property, its primary asset.

6. Meritage provided the first installment of data to MD Insider under the Agreement, which accepted and made commercial use of the data without complaint. However, MD Insider refused to comply with its contractual obligations under the Agreement and reimburse Meritage for the data provided.

7. At MD Insider's request, Meritage provided MD Insider with additional data above and beyond that specified in the Agreement. It was understood by both parties, however, that (i) such data was being supplied subject to the licensure, use limitations, and confidentiality obligations of the Agreement, and (ii) MD Insider would compensate Meritage for providing this data. MD Insider also refused to pay for this data.

8. MD Insider intentionally and with malicious intent disclosed this data in

2

its original form to a third party in clear contravention of the Agreement's provisions, fully cognizant that Meritage had only provided this additional data to MD Insider with the mutual understanding that it was subject to the Agreement's licensure, use limitations, and confidentiality provisions.

9. Rather than pay Meritage for the data provided, MD Insider manufactured trumped-up complaints that were entirely without merit in a thinly veiled attempt to avoid paying for any of the data it had received from Meritage.

10. Meritage brings this action for breach of contract (for MD Insider's (i) failure to pay for the first installment of data received under the Agreement, and (ii) breach of the Agreement's provisions barring MD Insider from disclosing Meritage's proprietary data to third-parties); for unjust enrichment (for MD Insider's failure to compensate Meritage for the additional data it received); and for preliminary and permanent injunctive relief (to prevent MD Insider from continuing to disclose Meritage's data in its original form to further third parties as required under the Agreement).

## Jurisdiction and Venue

11. This Court has jurisdiction pursuant to 28 U.S.C. § 1332, in that the parties are citizens of different states and the amount in controversy exceeds $75,000.

12. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(1), and further pursuant to the venue selection clause contained in the Agreement.

## The Parties

13. Meritage is a Pennsylvania S-corporation with its principal place of

business in Pennsylvania.

14. MD Insider is a is a Delaware corporation with a principal place of business in California.

### The Agreement

15. Meritage and MD Insider entered into the Agreement as of December 31, 2014. (Exhibit 1, at 1.)

16. Under the Agreement, Meritage, as Licensor, licensed to MD Insider, as Licensee, Meritage's "Licensed Data," defined therein as "all healthcare claims data to be supplied by [Meritage] according to the Access Specifications in the proper format." (Agreement at 1, ¶ 1.4.)

17. "Access Specifications," in turn, are defined in the Agreement as "the data fields, schedule, method, medium, format, structure, organization, archival, mapping, and other logistical, technical, legal, and other parameters (as detailed in Exhibit A) by which [Meritage] will provide [MD Insider] electronic access to and copies of the Licensed Data." (Agreement at 1, ¶ 1.1.) In other words, Exhibit A to the Agreement sets forth the technical specifications by which the data Meritage licenses to MD Insider is to be supplied.

18. MD Insider's use of the data licensed by Meritage under the Agreement is governed by paragraphs 2.1.1 and 2.1.2, which provide:

> 2.1.1 ... [Meritage] hereby grants [MD Insider] a limited, non-exclusive, non-sublicensable, non-transferable right and license to use, reproduce, modify and aggregate the Licensed Data for the purpose of developing the

4

>Licensee Product during the Term of this Agreement.
>
>2.1.2   [Meritage] hereby grants [MD Insider] . . . a limited, non-exclusive, non-transferable and non-sublicensable license and right to: (i) promote, market distribute, publicly display, sell and offer for sale, the Licensed Data to the extent incorporated in Licensee Products and which contains a Value Added Enhancement; and (ii) grant [MD Insider's] customers the right to access and use such Licensed Data, to the extent incorporated in or used by Licensee Products.

(Agreement at 2, ¶¶ 2.1.1, 2.1.2.)

19.   "Licensee Product" is defined in the Agreement as:

>any product or service created by or on behalf of [MD Insider] for the purpose of sale or licensing to one or more third parties which is based on the selective or strategic extraction, compilation, assimilation, manipulation, analysis, and/or presentation of aggregate data of the type that comprises the Licensed Data, as may be applicable, which is a derivative compilation of data (or analytical conclusion thereon) having commercial utility.  Such Licensee Products may be incorporated into [MD Insider's] currently existing products or products created hereinafter.

(Agreement at 1, ¶ 1.6.)

20.   "Value Added Enhancement" is defined as "such meaningful change to or enhancement of the Licensed Data, such that the Licensee Product(s) that incorporate the Value Added Enhancement are meaningfully different from Licensed Data by themselves."  (Agreement at 2, ¶ 1.19.)

21.   The scope of the license granted to MD Insider to use the Licensed Data provided by Meritage under the Agreement is thus clear.  MD Insider may use the data in developing its own products; it may sell, display, etc. the data to the extent the data is incorporated into a MD Insider product such that the data is in a meaningfully different form from the original data supplied by Meritage; and it may allow MD Insider

customers access to the data to the extent such data is incorporated into MD Insider products.

22. What is *not* permitted under any aspect of the license granted under the Agreement is for MD Insider to take the Licensed Data and pass that data on to third parties in its original form.

23. Indeed, paragraph 2.3 of the Agreement, entitled "Limitations on Use," makes this explicit:

> [MD Insider] shall have no right to and agrees not to, directly or indirectly . . . (ii) promote, market, sell, offer for sale, distribute, publically display, or grant access to the Licensed Data separate and apart from the Licensee Product; and (iii) provide third parties access to the Licensed Data or any portion of the Licensed Data other than (A) customers of [MD Insider] in accordance with the terms and conditions herein, and (B) [MD Insider's] employees, independent contractors and independent subcontractors . . . solely to the extent needed to assist [MD Insider] with the development and use of the Licensee Product and provided that such person has executed a non-disclosure agreement with [MD Insider] . . ., and (C) [MD Insider's] subcontractors . . . or agents, solely to the extent needed to assist [MD Insider] with the development and use of the Licensee Product.

(Agreement at 3, ¶ 2.3.)

24. Reinforcing the proscription on MD Insider's disclosure to third parties of Meritage's Licensed Data is the Agreement's Confidentiality provision. It provides, in relevant part, that:

> [E]ach party covenants and agrees that it shall hold (and shall cause its employees, agents, subcontractors and licensees to hold) confidential all Confidential Information of the disclosing party and shall not use or disclose such

>    Confidential Information, except as authorized in this
>    Agreement, without the express written consent of the
>    disclosing party.

(Agreement at 5, ¶ 3.1.)

25. "Confidential Information" is defined to include:

>    (i) a party's technical, marketing, product and business
>    affairs . . ., (iii) all proposals, plans, programs, analyses,
>    compilations, forecasts, studies, methodologies or other
>    documents prepared by a party . . . relating to the subject
>    matter of this Agreement . . .; and (iv) any other proprietary
>    information that the disclosing party desires to protect
>    against unrestricted disclosure by the receiving party and
>    that the receiving party knows or should know is
>    proprietary to the disclosing party.

(Agreement at 5-6, ¶ 3.2.)

26. Plainly, Meritage's Licensed Data comprises Confidential Information under the Agreement, which MD Insider is barred from disclosing to third parties under paragraph 3.1.

27. The Agreement memorializes the fees Meritage is to receive for the data it licenses to MD Insider, as set forth in Exhibit B thereto. (Agreement at 4, ¶ 2.7.1.) As is relevant here, the "Year 1 License" fee for the first installment of data to be supplied by Meritage to MD Insider is $536,020. (Agreement, Exhibit B.)

28. The Agreement provides for penalties where, as here, MD Insider fails to pay Meritage for the data licensed, including interest accruing at 1% per month and "all costs and expenses incurred by [Meritage] in collecting past due amounts, including, without limitation, attorneys' fees." (Agreement at 4, ¶ 2.7.2.)

29. Section 5.3 of the Agreement addresses "Remedies," and contemplates that injunctive and other equitable relief, such as that sought herein, is appropriate,

particularly for the type of harm at issue here – violation of the Agreement's confidentiality provision. It provides that:

> [E]ach party acknowledges that its failure to abide by the provisions of this Agreement, in particular (but without limitation) those under Section 3 [*i.e.*, Confidentiality], may cause immediate and irreparable harm to the other party, for which legal remedies may be inadequate. Therefore, in addition to any legal or other relief to which the first party may be entitled by virtue of the other party's failure to abide by these provisions, the first party shall be entitled to seek equitable relief, including, but not limited to preliminary and permanent injunctive relief . . . .

(Agreement at 8, ¶ 5.3.)

30. Exhibit C to the Agreement provides a mechanism by which MD Insider could validate the Meritage data to be supplied. It required that "[Meritage] shall run the Data Validation criteria . . . and report these validation templates to [MD Insider] with 30 days of the execution of the [Agreement]." (Agreement, Exhibit C.) If the data passed, the parties "agree to uphold the [Agreement] in its entirety. [MD Insider] agrees to remit all payment in full for the amount of $536,020 within 30 days of receipt of the Data Invoice, and honor all subsequent invoices and data updates are delivered as per the Agreement." (*Id.*)

### The Data Validation Test Passed

31. Following the execution of the Agreement, Meritage independently ran the agreed-upon acceptance test and confirmed that the data passed, under Exhibit C of the Agreement.

32. Meritage received no notice from MD Insider, as would have been required under Exhibit C of the Agreement, that the data validation test had failed.

33. As a result, MD Insider was bound to remit payment within 30 days of receipt of a Data Invoice under Exhibit C.

### Meritage Supplies the Licensed Data

34. Meritage supplied the first installment of Licensed Data to MD Insider under the Agreement by placing such data on a third party FTP site on January 25, 2015. MD Insider downloaded that data the next day.

35. MD Insider claimed to be unable to read the downloaded data, and so Meritage sent, via Federal Express, a hard drive containing the Licensed Data.

36. MD Insider received that hard drive, accessed the Licensed Data on the drive, and made use of the Licensed Data Meritage supplied to it under the Agreement.

37. MD Insider used and incorporated the Licensed Data supplied by Meritage under the Agreement into its Licensed Products.

38. Under ¶ 2.7.1 of and Exhibit B to the Agreement, the License Fees for this first installment of Licensed Data provided by Meritage to MD Insider are $536,020.

39. Meritage sent MD Insider the required "Data Invoice" on February 6, 2015, in the amount of $536,020. (A copy of the invoice is attached as Exhibit 2.) Under Exhibit C of the Agreement, payment was due from MD Insider with 30 days of its receipt of that invoice.

40. MD Insider refused to pay for the Licensed Data provided.

### Meritage Supplies Additional Licensed Data, and MD Insider Discloses It

41. After Meritage had supplied the first installment of Licensed Data to MD Insider under the Agreement, but before the second installment of Licensed Data was due, MD Insider approached Meritage and requested that it supply specified, additional

9

Licensed Data ("the Additional Licensed Data").

42. It was understood by Meritage, on the one hand, and MD Insider, on the other, that this Additional Licensed Data would be governed by the terms of the Agreement barring disclosure of Licensed Data in its original form to third parties. It was further understood by Meritage, on the one hand, and MD Insider, on the other, that MD Insider would pay $100,000 for this Additional Licensed Data. Absent these agreements, Meritage would not have supplied the Additional Licensed Data to MD Insider.

43. Meritage provided the requested Additional Licensed Data to MD Insider in February 2015.

44. MD Insider, despite its agreement, has not paid Meritage for the Additional Licensed Data.

45. Further, despite its agreement, and in flagrant violation of the Agreement's terms, MD Insider has disclosed the Additional Licensed Data in its original form to a third party, IMS Health.

**MD Insider Tries to Manufacture a Dispute to Avoid Making Payment**

46. Rather than pay Meritage for the Licensed Data and Additional Licensed Data it had received, MD Insider tried to create complaints out of whole cloth in order to allege that Meritage was somehow in breach of the Agreement.

47. On March 27, 2015, MD Insider's attorneys sent a letter to Meritage. (A copy of this letter is attached as Exhibit 3.)

48. Therein, MD Insider complained that Meritage had breached one of the warranty provisions of the Agreement, in that, according to MD Insider, Meritage "has been unable or unwilling to provide MD Insider with adequate evidence that Meritage

does, in fact, have authority to grant the licenses under the Agreement." According to MD Insider, this amounted to a violation of §2.6.1(i) of the Agreement. (Exhibit 3.)

49. Meritage, in response, provided MD Insider with a certification executed by Meritage's principal, Mark Brosso, regarding Meritage's authority to grant the license. (A copy of this certification is attached as Exhibit 4.) Meritage's attorneys further explained that "the source of the data as well as [the] data aggregation techniques and other processes deployed to deliver the data to MD Insider under the Agreement are confidential to Meritage," and thus could not be disclosed. (A copy of this letter is attached as Exhibit 5.)

50. Meritage further reminder MD Insider that Meritage did not have "any obligation to provide such information to MD Insider." (Exhibit 5.) And, indeed, while Meritage warranted under §2.1.6(i) that it "has the power and authority to enter into and perform this Agreement, including the granting of the license rights set forth herein," (Agreement at 4, ¶ 2.6.1(i)), nothing in the Agreement requires Meritage to provide to MD Insider "adequate evidence" of anything.

51. MD Insider's March 27, 2015 letter continued in its trumped-up accusations, claiming that "MD Insider has reason to believe that that MD Insider was fraudulently induced into entering into the Agreement through a series of misrepresentations . . . ." (Exhibit 3.)

52. These so-called "misrepresentations," according to MD Insider, "relate to, among other things, (i) the formation and history of Meritage, (ii) the source of the Licensed Data, (iii) the specific scope of the Licensed Data, and (iv) the relationship between Mark Brosso and David Brosso." (*Id.*) Mark Brosso (the principal of Meritage)

11

and David Brosso (a MD Insider employee and agent) are, as their last names suggest, brothers.

53.    MD Insider thus claimed fraud in the inducement of the Agreement based upon:

- "the formation and history of Meritage" – whatever that might mean;

- "the source of the Licensed Data" – despite (i) MD Insider's failure to provide any basis other than unsubstantiated attorney accusations for its claim that Meritage lacks the authority to use its data, (ii) Mark Brosso's certification to the contrary, and (iii) the lack of any requirement in the Agreement that Meritage provide the assurances MD Insider seeks;

- "the specific scope of the Licensed Data" – despite the fact that the data was received and made use of by MD Insider without complaint months before and employed and integrated by MD Insider in its own products, which were then marketed and sold to MD Insider's clients; and

- "the relationship between Mark Brosso and David Brosso" – brothers who have never made a secret of their relationship and whose past work history together was well known to MD Insider.

54.    Simply, MD Insider's allegations of "misrepresentations" are specious and amount to little more than spurious accusations with no aim other than to provide an attorney-manufactured basis for MD Insider's failure to pay Meritage for the data it received from Meritage.

### Count I – Breach of Contract – Failure to Pay

55.    The foregoing paragraphs are incorporated herein as if set forth in full.

56.    The Agreement is a contract binding upon Meritage and MD Insider.

57.    Meritage supplied the Licensed Data pursuant to the Year 1 License and otherwise performed its obligations under the Agreement, and thus was entitled to

$536,020 from MD Insider therefor.

58. MD Insider failed to provide the compensation it was contractually obligated to provide, and so is in material breach of the Agreement.

59. Meritage has been directly and proximately harmed as a result.

### Count II – Breach of Contract – Disclosure of Licensed Data to Third Parties

60. The foregoing paragraphs are incorporated herein as if set forth in full.

61. The Agreement is a contract binding upon Meritage and MD Insider.

62. The Agreement forbids MD Insider from disclosing Meritage data in its original form to third parties under, *inter alia*, §§ 2.1.1, 2.1.2, 2.3, and 3.1.

63. Meritage supplied the Additional Licensed Data to MD Insider and otherwise performed its obligations pursuant to the parties' agreement and mutual understanding.

64. Meritage and MD Insider agreed that the Additional Licensed Data would be subject to the non-disclosure restrictions contained in the Agreement as set forth above.

65. MD Insider, in material breach of the Agreement, disclosed the Additional Licensed Data to a third party, IMS Health.

66. Meritage has been directly and proximately damaged as a result.

### Count III – Unjust Enrichment

67. The foregoing paragraphs are incorporated herein as if set forth in full.

68. MD Insider was enriched by its receipt of the Additional Licensed Data, which it made use of and incorporated into its own products.

69. MD Insider's enrichment was at the expense and to the legal detriment of

Meritage, as MD Insider had agreed to compensate Meritage $100,000 for the Additional Licensed Data but refused to do so after it received and made use of the Additional Licensed Data.

70. Equity and good conscience militate against permitting MD Insider to retain the amount it agreed to pay Meritage for the Additional Licensed Data, where (i) MD Insider specifically requested the Additional Licensed Data, (ii) MD Insider expressly agreed to pay Meritage $100,000 for the Additional Licensed Data, and (iii) MD Insider received and made use of the Additional Licensed Data.

71. There is no justification for MD Insider's unlawful retention of this benefit.

72. Meritage may not have an adequate remedy at law and is entitled to recover $100,000 to prevent MD Insider's unjust enrichment.

### Count IV – Preliminary and Permanent Injunctions

73. The foregoing paragraphs are incorporated herein as if set forth in full.

74. The Agreement's non-disclosure and confidentiality provisions, including, *inter alia*, §§ 2.1.1, 2.1.2, 2.3, and 3.1, bar MD Insider from disclosing any data received by MD Insider from Meritage to third parties in its original form.

75. As set forth herein, MD Insider agreed that the Additional Licensed Data would be subject to these provisions.

76. MD Insider disclosed the Additional Licensed Data to a third party, IMS Health.

77. IMS Health is not bound by any duty of non-disclosure and is free to pass this data to additional third parties. Indeed, it may have already done so. IMS Health is

moreover free to incorporate Meritage's Additional Licensed Data into its own products, depriving Meritage of potential downstream revenue it might gain from licensing this data.

78.  Further, while MD Insider's disclosure of Meritage's Licensed Data in its original form to IMS Health is known, there may have been other disclosures by MD Insider of Meritage's Licensed Data in its original form of which Meritage is unaware. Plainly, MD Insider sees little need to comply with its obligations under the Agreement, as set forth herein.

79.  Disclosure of Meritage's Licensed Data in its original form presents grave risks to Meritage. Meritage's competitors, were they to obtain access to Meritage's Licensed Data, could figure out how Meritage develops is provider profiles, effectively reverse engineering from Meritage's work product to discover its proprietary algorithms and business logic. This would allow them to copy Meritage's work and to rob Meritage of its proprietary intellectual property.

80.  The harm to Meritage should MD Insider be permitted to continue disclosing Meritage's Licensed Data in its original form to third parties would be irreparable.

81.  MD Insider has absolutely no right to disclose Meritage's Licensed Data in its original form to third parties.

82.  MD Insider's liability to Meritage for the one instance of disclosure in breach of the Agreement that Meritage happened to discover to date is thus established, and the likelihood that Meritage will prevail on the merits of its claim that MD Insider disclosed its Licensed Data in violation of the Agreement is immense.

83. The hardship to MD Insider of requiring it to abide by the Agreement and keep Meritage's Licensed Data confidential, and to stop disclosing Meritage's Licensed Data to third parties, is non-existent.

84. In contrast, the harm to Meritage of permitting MD Insider to continue to disclose Meritage's confidential Licensed Data to third parties is enormous.

85. An injunction requiring MD Insider to abide by the Agreement and keep Meritage's Licensed Data confidential, and cease disclosing Meritage's Licensed Data to third parties, is in the public interest. The public interest is served where parties are required to honor their bargains; where a business that has spent decades developing expertise and complex business logic and specialized algorithms is not robbed of its assets by another party's breach of contract; and where third parties are not permitted to steal a company's proprietary business methods.

86. Paragraph 5.3 of the Agreement expressly provides that the very type of breach and harm at issue here are proper for preliminary and permanent injunctive relief.

WHEREFORE, Plaintiff, Meritage Data Inc., respectfully requests that this Court enter judgment in its favor and against Defendant, MD Insider, Inc., (i) awarding it $536,020 for breach of contract for MD Insider's failure to pay for the Licensed Data received under the Agreement, (ii) awarding it damages for MD Insider's disclosure of the Additional Licensed Data in violation of the non-disclosure and confidentiality provisions of the Agreement, (iii) awarding it $100,000 for unjust enrichment for MD Insider's failure to pay for the Additional Licensed Data, (iv) awarding it interest on its damages and attorneys' fees as provided in the Agreement, (v) providing preliminary and permanent injunctive relief barring MD Insider from further disclosure of Meritage's data

in its original form to third parties, and (vi) for any other and further relief that this Court deems just, proper and equitable.

                                          Respectfully submitted,

                                          EPSTEIN BECKER & GREEN, P.C.

                                          By: _/s/ Robert M. Travisano_
                                               Robert M. Travisano

                                          250 Park Avenue
                                          New York, NY 10177
Dated: May 8, 2015                       *Attorneys for Plaintiff, Meritage Data Inc.*

Of counsel:

Richard Gallucci, Esq.
Neal Troum, Esq.
Spector Gadon & Rosen, P.C.
1635 Market Street, 7th Floor
Philadelphia, PA 19103
215-241-8888
215-241-8844 (fax)
(*pro hac vice* application forthcoming)