UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MERITAGE DATA INC., | Civil Action No. 15-cv-03610-KPF |
| *Plaintiff,* | |
| v. | |
| MD INSIDER, INC., | **Declaration of Mark Brosso** |
| *Defendant.* | |

Mark Brosso, pursuant to 28 U.S.C. § 1746, being of full age, hereby declare as follows:

1. I am the President of Plaintiff, Meritage Data Inc. ("Meritage").

2. I respectfully make this declaration of my own personal knowledge except as otherwise indicated and in support of the motion of Meritage for Preliminary Injunctive Relief.

3. Prior to forming Meritage I acquired significant experience and expertise in the healthcare data industry. In 1999, I founded Health Market Science, Inc. The company developed healthcare provider data. Health Market Science was the very first company to use medical claims data to profile healthcare practitioner experience based on respective claims histories. Health Market Science sold in 2014 to LexisNexis for $140 million based on the products that I designed and developed.

4. In 2009, I co-founded Aileron Solutions, LLC. Aileron built a claims warehouse that formed the backbone of IMS Health's medical claims practitioner profiling. A product that they sell today to customers including Defendant MD Insider, Inc.

5. Plaintiff Meritage collects data from disparate sources throughout the health care industry, manipulates this data with complex, proprietary algorithms and business logic, and develops extensive provider profiles for licensure to and use by the broader healthcare industry.

6. One of Meritage's clients is Defendant MD Insider, Inc. ("MD Insider"), with whom Meritage entered into a Data Licensing Agreement ("the Agreement"). A true and correct copy of the Agreement is attached hereto as Exhibit 1. MD Insider provides health care users with physician performance profiles, using data acquired from sources such as Meritage.

7. Meritage and MD Insider entered into the Agreement as of December 31, 2014. (Exhibit 1, at 1.)

8. Under the Agreement, Meritage, as Licensor, licensed to MD Insider, as Licensee, Meritage's "Licensed Data," defined therein as "all healthcare claims data to be supplied by [Meritage] according to the Access Specifications in the proper format." (Agreement at 1, ¶ 1.4.)

9. "Access Specification," in turn, are defined in the Agreement as "the data fields, schedule, method, medium, format, structure, organization, archival, mapping, and other logistical, technical, legal, and other parameters (as detailed in Exhibit A) by which [Meritage] will provide [MD Insider] electronic access to and copies of the Licensed Data." (Agreement at 1, ¶ 1.1.) In other words, Exhibit A to the Agreement sets forth the technical specifications by which the data Meritage licenses to MD Insider is to be supplied.

9. MD Insider's use of the data licensed by Meritage under the Agreement is governed by paragraphs 2.1.1 and 2.1.2, which provide:

> 2.1.1  . . . [Meritage] hereby grants [MD Insider] a limited, non-exclusive, non-sublicensable, non-transferable right and license to use, reproduce, modify and aggregate the Licensed Data for the purpose of developing the Licensee Product during the Term of this Agreement.
>
> 2.1.2  [Meritage] hereby grants [MD Insider] . . . a limited, non-exclusive, non-transferable and non-sublicensable license and right to: (i) promote, market distribute, publicly display, sell and offer for sale, the Licensed Data to the extent incorporated in Licensee Products and which contains a Value Added Enhancement; and (ii) grant [MD Insider's] customers the right to access and use such Licensed Data, to the extent incorporated in or used by Licensee Products.

(Agreement at 2, ¶¶ 2.1.1, 2.1.2.)

10. "Licensee Product" is defined in the Agreement as:

> any product or service created by or on behalf of [MD Insider] for the purpose of sale or licensing to one or more third parties which is based on the selective or strategic extraction, compilation, assimilation, manipulation, analysis, and/or presentation of aggregate data of the type that comprises the Licensed Data, as may be applicable, which is a derivative compilation of data (or analytical conclusion thereon) having commercial utility. Such Licensee Products may be incorporated into [MD Insider's] currently existing products or products created hereinafter.

(Agreement at 1, ¶ 1.6.)

11. "Value Added Enhancement" is defined as "such meaningful change to or enhancement of the Licensed Data, such that the Licensee Product(s) that incorporate the Value Added Enhancement are meaningfully different from Licensed Data by themselves." (Agreement at 2, ¶ 1.19.)

12. The scope of the license granted to MD Insider to use the Licensed Data

3

provided by Meritage under the Agreement is thus clear. MD Insider may use the data in developing its own products; it may sell, display, etc. the data to the extent the data is incorporated into a MD Insider product such that the data is in a meaningfully different form from the original data supplied by Meritage; and it may allow MD Insider customers access to the data to the extent such data is incorporated into MD Insider products.

13. What is *not* permitted under any aspect of the license granted under the Agreement is for MD Insider to take the Licensed Data and pass that data on to third parties in its original form.

14. Indeed, paragraph 2.3 of the Agreement, entitled "Limitations on Use," makes this explicit:

> [MD Insider] shall have no right to and agrees not to, directly or indirectly . . . (ii) promote, market, sell, offer for sale, distribute, publically display, or grant access to the Licensed Data separate and apart from the Licensee Product; and (iii) provide third parties access to the Licensed Data or any portion of the Licensed Data other than (A) customers of [MD Insider] in accordance with the terms and conditions herein, and (B) [MD Insider's] employees, independent contractors and independent subcontractors . . . solely to the extent needed to assist [MD Insider] with the development and use of the Licensee Product and provided that such person has executed a non-disclosure agreement with [MD Insider] . . ., and (C) [MD Insider's] subcontractors . . . or agents, solely to the extent needed to assist [MD Insider] with the development and use of the Licensee Product.

(Agreement at 3, ¶ 2.3.)

15. Reinforcing the proscription on MD Insider's disclosure to third parties of Meritage's Licensed Data is the Agreement's Confidentiality provision. It provides, in relevant part, that:

4

> [E]ach party covenants and agrees that it shall hold (and shall cause its employees, agents, subcontractors and licensees to hold) confidential all Confidential Information of the disclosing party and shall not use or disclose such Confidential Information, except as authorized in this Agreement, without the express written consent of the disclosing party.

(Agreement at 5, ¶ 3.1.)

16. "Confidential Information" is defined to include:

> (i) a party's technical, marketing, product and business affairs . . ., (iii) all proposals, plans, programs, analyses, compilations, forecasts, studies, methodologies or other documents prepared by a party . . . relating to the subject matter of this Agreement . . .; and (iv) any other proprietary information that the disclosing party desires to protect against unrestricted disclosure by the receiving party and that the receiving party knows or should know is proprietary to the disclosing party.

(Agreement at 5-6, ¶ 3.2.)

17. Plainly, Meritage's Licensed Data comprises Confidential Information under the Agreement, which MD Insider is barred from disclosing to third parties under paragraph 3.1.

18. The Agreement memorializes the fees Meritage is to receive for the data it licenses to MD Insider, as set forth in Exhibit B thereto. (Agreement at 4, ¶ 2.7.1.) As is relevant here, the "Year 1 License" fee for the first installment of data to be supplied by Meritage to MD Insider is $536,020. (Agreement, Exhibit B.)

19. The Agreement provides for penalties where, as here, MD Insider fails to pay Meritage for the data licensed, including interest accruing at 1% per month and "all costs and expenses incurred by [Meritage] in collecting past due amounts, including,

5

without limitation, attorneys' fees." (Agreement at 4, ¶ 2.7.2.)

20. Section 5.3 of the Agreement addresses "Remedies," and contemplates that injunctive and other equitable relief, such as that sought herein, is appropriate, particularly for the type of harm at issue here – violation of the Agreement's confidentiality provision. It provides that:

> [E]ach party acknowledges that its failure to abide by the provisions of this Agreement, in particular (but without limitation) those under Section 3 [*i.e.*, Confidentiality], may cause immediate and irreparable harm to the other party, for which legal remedies may be inadequate. Therefore, in addition to any legal or other relief to which the first party may be entitled by virtue of the other party's failure to abide by these provisions, the first party shall be entitled to seek equitable relief, including, but not limited to preliminary and permanent injunctive relief . . . .

(Agreement at 8, ¶ 5.3.)

21. Exhibit C to the Agreement provides a mechanism by which MD Insider could validate the Meritage data to be supplied. It required that "[Meritage] shall run the Data Validation criteria . . . and report these validation templates to [MD Insider] with 30 days of the execution of the [Agreement]." (Agreement, Exhibit C.) If the data passed, the parties "agree to uphold the [Agreement] in its entirety. [MD Insider] agrees to remit all payment in full for the amount of $536,020 within 30 days of receipt of the Data Invoice, and honor all subsequent invoices and data updates are delivered as per the Agreement." (*Id.*).

### The Data Validation Test Passed

22.     Following the execution of the Agreement, Meritage independently ran the agreed-upon acceptance test and confirmed that the data passed, under Exhibit C of the Agreement.

23.     Meritage received no notice from MD Insider, as would have been required under Exhibit C of the Agreement, that the data validation test had failed.

24.     As a result, MD Insider was bound to remit payment within 30 days of receipt of a Data Invoice under Exhibit C.

### Meritage Supplies the Licensed Data

25.     Meritage supplied the first installment of Licensed Data to MD Insider under the Agreement by placing such data on a third party FTP site on January 25, 2015. MD Insider downloaded that data the next day.

26.     MD Insider claimed to be unable to read the downloaded data, and so Meritage sent, via Federal Express, a hard drive containing the Licensed Data.

27.     MD Insider received that hard drive, accessed the Licensed Data on the drive, and made use of the Licensed Data Meritage supplied to it under the Agreement.

28.     MD Insider used and incorporated the Licensed Data supplied by Meritage under the Agreement into its Licensed Products.

29.     Under ¶ 2.7.1 of and Exhibit B to the Agreement, the License Fees for this first installment of Licensed Data provided by Meritage to MD Insider are $536,020.

30.     Meritage sent MD Insider the required "Data Invoice" on February 6, 2015, in the amount of $536,020. (A true and correct copy of the invoice is attached as Exhibit 2.) Under Exhibit C of the Agreement, payment was due from MD Insider with

7

30 days of its receipt of that invoice.

31. MD Insider refused to pay for the Licensed Data provided.

32. After Meritage had supplied the first installment of Licensed Data to MD Insider under the Agreement, but before the second installment of Licensed Data was due, MD Insider approached Meritage and requested that it supply specified, additional Licensed Data ("the Additional Licensed Data").

33. The Additional Licensed Data provided to MD Insider is highly confidential proprietary business information developed by Meritage. The proprietary Additional Licensed Data at issue that was supplied to MD Insider by Meritage is comprised of (1) the Allcodes table; (2) Code Groupings; (3) Meritage's Claims Data Warehouse Structure; and (4) business logic for scoring claims data.

34. By way of background, the acronyms ICD, CPT and HCPCS are medical billing terminologies and taxonomies and/or coding systems. For a healthcare practitioner to bill for their diagnoses and or procedures performed, they bill under one or more of these coding systems.

35. "ICD" stands for International Classifications of Diseases - 9th Edition. These are coding systems for diagnoses in the outpatient setting and procedures in the inpatient setting.

36. "CPT" stands for C6urrent Procedure Taxonomy and is a coding system developed and maintained by the American Medical Association (AMA). This is a coding system for professional billing for procedures performed by healthcare practitioners.

37. "HCPCS" stands for Healthcare Common Procedure Coding System is a coding system developed and maintained by the Centers for Medicare and Medicaid Services (CMS) which is an expanded coding system (an expansion of the CPT coding system) for professional billing for procedures performed by healthcare practitioners.

**Meritage's Allcodes Table**

38. CMS claims data is coded with both ICD-9 and HCPCS/CPT codes. Different codes are used for different claim types as well as for different settings. Examples of different "claim" types are diagnosis versus procedure claims. Examples of different "settings," are inpatient versus outpatient versus skilled nursing, etc.

39. Generally, ICD-9 codes represent diagnoses and HCPCS/CPT codes represent procedures. However, there is an exception, namely, ICD-9 codes represent procedures within inpatient but diagnoses within outpatient. HCPCS/CPT codes are 5 digit codes in which HCPCS codes are added to the AMA's CPT coding system. ICD-9 codes are 3, 4 and 5 digit codes with periods or decimal places at the 3rd position (from the left). CMS has historically eliminated the period or decimals that exist within ICD-9 codes making ICD-9 codes 5 digit codes that sometimes are the exact same 5 digit codes as HCPCS/CPT codes. This, in turn, can create confusion when looking for certain codes that can represent two entirely different procedures (in an inpatient setting) or between diagnoses and procedures in other settings.

40. Meritage built the allcodes database to give customers such as MD Insider the ability to build rules around the scenario when the same 5 digit code should be counted as an ICD9 code or when it should be counted as a HCPCS/CPT code. CMS supplies no such support table to its data. This is developed by Meritage through its own

9

labor and expense.

### Meritage's Code Groupings

41. Individual ICD-9 and HCPCS/CPT codes are too granular to make sense of the data. For example, one institution or doctor when coding a diagnosis or procedure may consistently use a 3 or 4 digit ICD-9 code while another may consistently use a 5 digit ICD-9 code. Thus, make sure one is making a proper comparison individual ICD-9 and HCPCS/CPT codes are grouped into "buckets" that better represent the general disease state, disorder, condition or practice patterns.

42. Meritage Data has built hundreds of groupings that make-up its proprietary information. These code groupings are not supplied by CMS and takes Meritage many hours or research to build these code groupings comprised of condition "buckets." There is no dispute that MD Insider received 110 such conditions through Meritage.

### Meritage's Claims Data Warehouse Structure

43. In order to be able to query across five different settings and multiple years of data, Meritage undertook a massive effort to take CMS data and, in turn, reformat the data to normalize what are known as "flat files," as well as to consistently code multiple file record layouts and data dictionaries to a single consistent format.

44. More specifically, CMS data has different file record layouts and data dictionaries for each of their different settings. In addition, year-to-year, these file record layouts and data dictionaries changed as CMS shifted from flat file formats to a semi-normalized structure.

45. Meritage undertook a painstaking process of mapping each of the various

10

CMS fields from each of the various file record layouts and data dictionaries, and built a single data structure that elegantly warehouses all of the CMS data.

46. Meritage then loaded all of the CMS data into this single standard and delivered multiple terabytes of this data to MD Insider. Not only did Meritage deliver MD Insider a more consistent and easily accessible format for querying the data, but Meritage delivered the database structure to MD Insider.

47. The fact that MD Insider has remained silent on their use of the data and the database structure, is very troubling to Meritage. Even if MD Insider were to effectively strip this data out, MD Insider could keep this proprietary data structure which can be easily transformed out of the Oracle export files it was delivered in to be put into any other relational database system. This warehouse structure is specific to Meritage and developed out of its sole efforts.

### Meritage's Business Logic for Scoring Claims Data

48. In order to score doctors as well as institutional providers, the core of MD Insider's product offering, getting claims data is part of the overall solution. Using claims data is more problematic. Meritage built logic for being able to sensibly utilize the claims data in order to make peer-to-peer comparisons and then, in turn, score providers. In addition, Meritage supplied the manner in which providers were to be compared to each other in terms of segmentation by equal counts of claims.

49. MD Insider wants to evaluate a physician providers across multiple settings as well as multiple years of claims for particular conditions. In sum by providing MD Insider with the confidential proprietary information as described above, Meritage supplied a single data warehouse to query, along with the groupings to roll up the

11

individual ICD-9 and HCPCS/CPT codes to particular procedures and conditions and, thereafter, supplied MD Insider with the tools and business logic to be able to properly count claims, without miscounting or overcounting, to fairly represent the physicians in peer-to-peer rankings.

### Meritage Supplies Additional Licensed Data, and MD Insider Discloses It

50.  It was understood by Meritage, on the one hand, and MD Insider, on the other, that this Additional Licensed Data as described above would be governed by the terms of the Agreement barring disclosure of Licensed Data in its original form to third parties. It was further understood by Meritage, on the one hand, and MD Insider, on the other, that MD Insider would pay $100,000 for this Additional Licensed Data. Absent these agreements, Meritage would not have supplied the Additional Licensed Data to MD Insider.

51.  Meritage provided the requested Additional Licensed Data to MD Insider in February 2015.

52.  MD Insider, despite its agreement, has not paid Meritage for the Additional Licensed Data.

53.  Further, despite its agreement, and in flagrant violation of the Agreement's terms, MD Insider has disclosed the Additional Licensed Data in its original form to a third party, IMS Health.

54.  Indeed, on March 6, 2015, MD Insider employee David Brosso sent the 110 codes groups developed by Meritage directly to Kevin Jones of IMS Health. Accordingly, there is no dispute that Meritage's proprietary information in unadulterated form was wrongfully disclosed. (A true and correct copy of this email is attached hereto

12

as Exhibit 3.) IMS Health subsequently sent back to MD Insider so-called "HPD Reports." (A true and correct copy of this email is attached hereto as Exhibit 4.) These IMS Health HPD Reports are "Hospital Projected Data," and the HPD Reports IMS Health sent back to MD Insider were summaries of annual volumes of diagnoses and procedure volumes at the facility level that were based on the 110 Code Groupings MD Insider received in the Additional Licensed Data from Meritage and wrongfully disclosed to IMS Health.

55. The Agreement's non-disclosure and confidentiality provisions, including, *inter alia*, §§ 2.1.1, 2.1.2, 2.3, and 3.1, bar MD Insider from disclosing any data received by MD Insider from Meritage to third parties in its original form.

56. IMS Health is not bound by any duty of non-disclosure and is free to pass this data to additional third parties. Indeed, it may have already done so. IMS Health is moreover free to incorporate Meritage's Additional Licensed Data into its own products, depriving Meritage of potential downstream revenue it might gain from licensing this data.

57. Further, while MD Insider's disclosure of Meritage's Licensed Data in its original form to IMS Health is known, there may have been other disclosures by MD Insider of Meritage's Licensed Data in its original form of which Meritage is unaware.

58. Most notably, on June 23, 2015, MD Insider announced that it is opening up its platform which includes Meritage's proprietary information, for free to employers. A true and correct copy of MD Insider's June 23, 2015 press release is attached hereto as Exhibit 5.

59. Disclosure of Meritage's Licensed Data in its original form presents grave

13

risks to Meritage. Meritage's competitors, were they to obtain access to Meritage's Licensed Data, could figure out how Meritage develops is provider profiles, effectively reverse engineering from Meritage's work product to discover its proprietary algorithms and business logic. This would allow them to copy Meritage's work and to rob Meritage of its proprietary intellectual property.

60. The harm to Meritage should MD Insider be permitted to continue disclosing Meritage's Licensed Data in its original form to third parties would be irreparable as it will wholly undercut Meritage's entire business and will likely result in putting Meritage out of business.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

*[signature]*
MARK BROSSO

Dated: July 31, 2015